IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 28, 2003

## STATE OF TENNESSEE v. ALFRED EUGENE BRADLEY

**Direct Appeal from the Criminal Court for Hamilton County**
**Nos. 234375, 233962, 234979    Rebecca Stern, Judge**

---

**No. E2002-02840-CCA-R3-CD**
**February 5, 2004**

---

The defendant was convicted by a Hamilton County Criminal Court jury of four counts of attempted first degree murder, Class A felonies; aggravated arson, a Class A felony; and false imprisonment, assault, and theft under $500, all Class A misdemeanors. He was sentenced by the trial court to an effective sentence of twenty-two years and six months in the Department of Correction. Following the denial of his motion for a new trial, the defendant filed a timely appeal to this court, raising the following issues: (1) whether the evidence was sufficient to support his convictions for aggravated arson and attempted first degree murder; (2) whether the trial court erred in denying his motion to suppress his statements to law enforcement officers; (3) whether the trial court erred in allowing the State to call a rebuttal witness during the presentation of its case in chief; (4) whether the trial court properly sentenced the defendant for his attempted first degree murder and aggravated arson convictions; and (5) whether the cumulative errors prevented the defendant from receiving a fair trial. Based on our review, we affirm the judgments of the trial court, but remand for entry of a corrected judgment for the defendant's assault conviction in Count 2 of Case No. 234375.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Melanie R. Snipes, Chattanooga, Tennessee, for the appellant, Alfred Eugene Bradley.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William H. Cox, III, District Attorney General; and Lila J. Statom and David W. Denny, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The convictions in this case stem from three separate indictments issued by the Hamilton County Grand Jury against the defendant, Alfred Eugene Bradley, in which he was charged with the May 23, 2000, theft of property from the duplex of his former girlfriend, Audrey Thompson; the May 25, 2000, kidnapping and assault of Thompson; and the June 3, 2000, aggravated arson of Thompson's duplex and attempted first degree murder of Thompson's three children and her male friend, Blevins Espey.

Audrey Thompson testified at trial as follows. In May 2000, she lived in a duplex on Milne Street in Chattanooga with her three young sons and the defendant, whom she had been dating for eight to nine months. However, she and the defendant broke up, and she asked him to move out. On May 23, 2000, she telephoned the police from a friend's residence and requested that officers meet her at the duplex. The defendant was already there when the police arrived, and she asked him in the presence of an officer to gather his belongings, return his key, and leave. After the defendant's departure, she went into the duplex with the officer and discovered that the defendant had cut a hole in her waterbed and taken some of her property, including her children's clothing and pictures from the wall. The officer filed charges against the defendant based on his theft of property. At a later point, the defendant returned to the duplex and took a bicycle that belonged to her son.

Thompson testified that a day or two after the defendant moved out, he pulled up in his car beside her as she was arriving for her 11:00 p.m. to 7:00 a.m. work shift at Heritage Hosiery. The defendant got out of his car and said, "[B]itch, I'm going to kill you. Why you take out a warrant on me[?]" When she told the defendant that she had not taken out a warrant against him, he told her to shut up, and they scuffled before he pushed her into his car and drove off. As he drove, the defendant told her that he loved her and wanted the chance to start over in another city, but feared he would be charged with kidnapping. Because she was afraid, she told the defendant that she loved him, too, and was willing to go wherever he wanted. At one point, the defendant parked the car in order to talk. They began arguing, and he choked her neck and hit her in the face. Later, the defendant stopped for gasoline, and she gave him some cash and accompanied him into the service station to pay.

Thompson testified she managed to escape when the defendant stopped on the side of the road to repair the car's headlights and take a screwdriver from the trunk of the car, with which he threatened to kill himself. She said she drove off while the defendant was outside the car, returned to Heritage Hosiery, and immediately telephoned the police to report the kidnapping. Thompson conceded none of her coworkers saw her scuffle with the defendant and acknowledged she did not tell the service station attendant that she was being kidnapped. She explained, however, that the defendant had accompanied her into the service station and warned her not to say anything to the attendant.

Thompson testified that the defendant telephoned her over twenty times on the night of the fire, with his last call coming sometime after midnight. The defendant cried, told her he loved her, and demanded to know if she had someone with her at the house. She told him it was none of his business, and he replied, "[I]f I ever find out you've been with somebody, bitch, I'm going to kill

you." Thompson said she awoke sometime after 4:00 a.m. and decided to drive to a nearby Texaco station to buy cigarettes. Her friend, Blevins Espey, was in the duplex when she left, along with her three young sons. She returned approximately fifteen minutes later to find her children outside crying and the house on fire. Thompson acknowledged she did not see the defendant when she left for the store.

Latiki Pankey, Thompson's next-door neighbor at the time of the fire, confirmed that her duplex sustained water damage from Thompson's waterbed on the day the defendant moved out of Thompson's duplex. She said she was later sitting on the front porch of the duplex when she saw the defendant take a bicycle from Thompson's duplex and load it into a van. According to Pankey, the defendant had a conversation with her at that time in which he threatened Thompson's children, saying "the kids on the track, the train come, bam, they're dead." Pankey testified that the duplex fire occurred approximately one week later.

Detective Beth Stafford of the East Ridge Police Department testified she investigated the May 25, 2000, kidnapping and took a statement from the victim. Based on that statement, an arrest warrant was issued for the defendant, which was outstanding at the time the defendant was arrested for arson.

Thompson's oldest son, fifteen-year-old Aubrey Johnson, testified he was thirteen at the time of the fire and had stayed up late that night to talk on the telephone with a girl. Their telephone service included call waiting, and the defendant called "a numerous amount of times," wanting to speak with Johnson's mother, during Johnson's conversation with his friend. After his mother left the house, Johnson took his one-year-old brother into his bedroom to sleep with him, shut and locked his door, and dozed off. About five minutes later, he was awakened by the sound of running and someone trying to open his bedroom door. When he realized the house was on fire, he got his little brother and exited the house. He did not see the defendant that night.

Waylon McKinney, the owner of the duplex, testified he went to check his property early on the morning of June 3 after his maintenance employee informed him of the fire. It was still dark as he drove to the duplex, and he inadvertently took a wrong turn, mistakenly driving down Cooley, which was one street over from Milne. There, he saw an African-American man lying facedown in the road on top of a bicycle and a puddle of blood nearby. After calling 9-1-1, McKinney drove to his duplex, where he informed an officer at the scene about the man in the road. McKinney testified that his insurance company declared the duplex a total loss as a result of the fire.

Blevins Espey testified he spent the night of the fire with Thompson, whom he had been dating at that time for about two weeks, and her three children at Thompson's duplex on Milne Street. At some point that evening, he and Thompson went into her bedroom and fell asleep. However, at 2:30 or 3:00 a.m., Thompson awoke and decided to leave the house to buy cigarettes. Four or five minutes after her departure, Espey heard a window crack in the bedroom, turned to look, and saw that a "gas bottle" had hit the floor and set the bedroom on fire. As he left the bedroom, Espey heard a second window shatter in the children's bedroom and saw a second fire. He then

grabbed the children and ran out of the house. Espey acknowledged he had been convicted of theft of property and two counts of robbery in 1994.

Troy Alton testified he was an officer with the East Ridge Police Department in May 2000 and responded to the report of Thompson's kidnapping. He did not remember if he had taken any photographs of the victim's injuries; however, he had listed on his report that there was an injured person involved. Alton acknowledged the only information he had received about the crime came from the victim and that, to his knowledge, there were no other witnesses to the crime.

Anthony Simon testified he was driving home from a late night cookout sometime between 4:30 and 5:00 a.m. on June 3, 2000, when he passed a clean-shaven, African-American man wearing a dark shirt, who was slowly pushing a bicycle down either Orchard Knob or Roanoke. He and the man made eye contact as he passed, and Simon noticed the man's facial features. When Simon came to the scene of the fire, he reported the man to Captain Jacks, the fire investigator at the scene. Simon testified that Captain Jacks later asked him to go to the hospital, where he positively identified the defendant as the man he had seen with the bicycle. Simon acknowledged, however, that he did not mention anything about a bicycle when he first spoke with Captain Jacks.

Phillip Woodall, a supervisor at Heritage Hosiery, testified he remembered an occasion in which Thompson had shown up late to work, visibly shaking and asking to use the telephone to call the police. Thompson told him that she had been kidnapped by her boyfriend and driven toward Cleveland, but had managed to drive away when her boyfriend got out of the car. Woodall acknowledged that many people worked the third shift, and he did not notice any bruises on Thompson.

Officer Jacque Weary of the Chattanooga Police Department testified that the defendant called the police department on May 23, 2000, to report that Thompson had left her children alone and that he wanted to file neglect charges against her. Upon investigating at the Milne Street duplex, however, he determined that the child in question, who was nine, was old enough to be left alone. Moreover, the defendant was living with Thompson at the time and was supposed to have been caring for the child. Thompson arrived home as he was investigating the defendant's complaint and "wanted [the defendant] gone." He accompanied the defendant inside as he retrieved his belongings, while Thompson waited outside. When the defendant left, he gave Officer Weary a key that did not fit the duplex's door. Officer Weary then accompanied Thompson inside, and Thompson told him that the defendant had cut her waterbed and taken some of her property. As a result, Officer Weary took out warrants against the defendant for vandalism and theft.

Officer Weary testified he next went to the Milne Street residence on June 3, 2000, in response to the report of the fire. At about 6:00 a.m., he received a report of a man down on Roanoke Street, which was close to Milne. It was still dark at the time, however, and he and a fellow officer were unable to find anyone when they searched that location. Sometime around 7:00 a.m., they received a second report of a man down on Cooley Street, which was perpendicular to Roanoke. Upon investigating, they found the defendant lying facedown in a pool of blood and entangled in a

BMX bicycle. The defendant smelled strongly of alcohol and gasoline or kerosene and had his eyes closed. He opened his eyes when they shook him and began asking him what had happened, but he did not reply to any of Officer Weary's questions.

Officer Weary testified that Officer Fugh arrived soon thereafter and asked the defendant if he had hurt himself in the fire. The defendant "opened his eyes, he took a deep breath and said yes," at the same time giving a half nod. Officer Weary later heard Captain Jacks ask the defendant a similar question and saw the defendant again nod yes. However, when Captain Jacks retrieved a tape recorder and asked the defendant a second time, the defendant did not respond. Officer Weary testified there was a large pool of blood near the bicycle, other pools of blood nearby, and blood droplets leading from the scene. He said they "traced the blood droplets from the street on Cooley back down Roanoke across a yard where the church is over onto Willow Street. And it stopped at Willow Street. And Willow is perpendicular to Milne."

Chattanooga Police Officer Andre Fugh testified that the defendant was "all balled up on the bicycle" with a large pool of blood nearby. He said they were initially unable to get any response from the defendant, but he eventually "came to a little bit before the ambulance" arrived. When they asked him his name, the defendant first mumbled "Alfred" and then, in response to a request for his last name, "Bradley." Officer Fugh then asked the defendant if he had set the house on fire, to which he replied, "[Y]eah," before passing out again. However, when the same question was later asked of him when a tape recorder was present, the defendant said nothing. Officer Fugh said he smelled alcohol and gasoline on the defendant's person and saw a large gash on the inside of his forearm. He acknowledged the defendant was "kind of dazed" during his conversation with him and described his appearance as follows: "The whole time he was like mumbling a little bit. He would say something and he would be out. And we asked him about the fire and he said yeah and he went out again." Officer Fugh testified the defendant began regaining consciousness after he was placed in the ambulance.

Sean Slaughter, a paramedic with the Hamilton County Emergency Medical Services, testified that he and his partner, EMT Mike Johnston, received three separate calls on the morning of June 3, 2000, directing them to three different locations where a man had been reported down. The first two calls were cancelled before they arrived due to the police officers' failure to locate a subject at those scenes. On their third call, they were directed to Cooley Street, where they found the defendant facedown in a large pool of blood beside a bicycle. A second pool of blood was ten feet down the sidewalk, with yet another pool of blood ten to twenty feet beyond that. Slaughter testified he asked the defendant what had happened to him, and the defendant replied that he had cut his arm on some glass. The only injuries he could find on the defendant "were several lacerations of varying sizes and depth on the right arm, extending from the elbow down to the hand[,]" the worst of which was a wound in the bend of his elbow which had severed a vein and was causing the defendant to lose large amounts of blood. Based on the defendant's injury and the pattern of blood at the scene, Slaughter theorized the following:

[W]hat appeared to have happened was he was losing blood at a rate such that it would get to a certain point and he would pass out. As soon as he was laying [sic] down[,] his blood pressure would get to a point again where he could get up and would go again. Just an educated guess, where he would get back on the bicycle and start to peddle again his heart would start to pump a little faster, have more blood flowing through his veins and he would lose more blood, which would cause him to pass out.

Slaughter testified he gave Captain Jacks permission to speak to the defendant in the back of the ambulance while he and Johnston were still working on the defendant at the scene. He said Captain Jacks asked the defendant if he had cut his hand throwing a gasoline bomb through the window, and the defendant "shook his head yes." However, when Captain Jacks brought out a tape recorder and asked if he could record the defendant stating he had hurt himself putting his hand through a window, the defendant said, "[N]o, I did not say that, man."

Slaughter testified the defendant's injury was consistent with someone having cut himself on glass. He said the defendant was wearing a pair of shorts and a t-shirt. He did not smell any gasoline on the defendant, but did smell alcohol on his breath. The defendant was "lethargic" when Slaughter arrived, rather than drifting in and out of consciousness. However, he was coherent prior to Captain Jacks's questioning and was able to provide Slaughter with his name, date of birth, and medical history.

Captain Randy Jacks of the Chattanooga Fire Department, who was accepted as an expert in the area of fire investigation, testified the Milne Street duplex fire was an arson. He said the initial call on the fire went out at 4:48 a.m., and he was dispatched to investigate after the firefighters arrived at the scene. He was collecting evidence at the scene of the fire at 5:50 a.m., when he was notified that the defendant had been found on Cooley Street. By the time he arrived there, at approximately 6:00 a.m., the defendant had been loaded into an ambulance. Captain Jacks testified the paramedics gave him permission to talk to the defendant, and he stepped into the ambulance and asked the defendant how he had cut himself. The defendant said nothing at first, but when Captain Jacks asked if he had cut his arm on glass from the house fire, he nodded yes. Captain Jacks then stepped out of the ambulance, retrieved his tape recorder, and went back into the ambulance to ask the defendant the question again. However, when the defendant saw the tape recorder, his eyes "bugged," and he said, "I didn't say that man."

Captain Jacks testified the fire had two points of origin: one in the children's bedroom and one in Ms. Thompson's bedroom. He said he found a strong odor of gasoline in the children's bedroom, a window that had been broken from the outside, pieces of glass on the floor that appeared to have blood on them, small spots of blood on the wall outside the window and on a window screen lying beside the window, bright red blood on pieces of glass lying on the ground beneath the window, and a burn pattern consistent with a flammable liquid having been thrown against the wall. He said he found the second point of origin beneath a window in Thompson's bedroom, where he

again detected the odor of gasoline, indicating that it was "an area where an accelerant was poured." There was blood on the ground beneath this window as well. Captain Jacks testified he sent the samples of blood and other evidence he collected at the scene, along with the defendant's clothing and a sample of the defendant's blood, to the Tennessee Bureau of Investigation ("TBI") Crime Laboratory in Nashville for analysis.

On cross-examination, Captain Jacks testified that, based on his experience, "a fire like that when something is thrown through a window is usually a Molotov cocktail." He conceded, however, that he did not find a Molotov cocktail in the house, and, to his knowledge, the defendant did not have any burns. On redirect, he testified that it was possible the fire had been started by someone breaking a window, pouring an accelerant inside the window, and igniting the accelerant. He said he had never personally investigated an arson in which the arsonist received any burns.

Tara Barker, a special agent forensic scientist with the TBI, testified her analysis revealed the presence of a "gasoline range product" in a sample of fire debris from the children's bedroom, in two samples of fire debris from the back bedroom, and on the clothing of the defendant. On cross-examination, she acknowledged that a "gasoline range product" includes ordinary automotive gasoline.

Michael Turbeville, a forensic scientist in the DNA serology unit of the TBI Crime Laboratory in Nashville, testified he was provided with several samples to analyze in connection with the case. His results were as follows: the glass outside the children's window tested presumptively positive for blood, but he was unable to determine if it was human blood; a second glass sample recovered from the scene contained human blood, but "no DNA profile was obtained due to an insufficient amount or degraded DNA sample"; grass found outside Thompson's bedroom window tested positive for human blood, but again, no DNA profile was obtainable due to "insufficient or degraded sample"; and finally, reddish-brown stains found on a metal window frame were possibly blood, but he was unable to determine if they were human blood. Turbeville testified that heat is one of the worst enemies of DNA.

Dr. David Leonard Ciraulo, a trauma critical care surgeon at Erlanger Medical Center, testified the defendant's main injury was a transection of the radial artery, which was repaired with surgery. The injury was consistent with a cut from glass but could have been caused by any sharp object. The defendant's blood-alcohol level was .17%, and he also tested positive for cocaine. Nonetheless, the defendant remained either a 14 or a 15 on the "Glasgow Coma Scale" during his time in the trauma unit, meaning that he was "awake, alert and oriented times three." However, Dr. Ciraulo acknowledged that the defendant's medical records indicated he was too inebriated to provide an accurate history to the plastic surgeon. He further acknowledged that the defendant's medical records showed, in addition to the injury to his right arm, an abrasion to the leg, lacerations of the left arm, and a "mark" on the left hand.

The defendant elected not to testify, and rested his case without the presentation of any proof. After deliberating, the jury found the defendant guilty of all the indicted charges, with the exception

of kidnapping, for which it found him guilty of the lesser-included offense of false imprisonment. Following a sentencing hearing, the trial court sentenced the defendant as a Range I, standard offender to twenty-one years for each of the attempted first degree murder convictions; as a violent offender to twenty-two years at 85% release eligibility for the aggravated arson conviction; and as a Range I, standard offender to six months each for the false imprisonment, assault, and theft under $500 convictions. The trial court ordered the defendant's six-month sentence for theft under $500 to be served consecutively to his twenty-two-year sentence for aggravated arson, for an effective sentence of twenty-two years, six months in the Department of Correction.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant raises as his first issue whether the evidence was sufficient to support his convictions. Although he does not make it clear, he appears to challenge only the sufficiency of the evidence in support of his aggravated arson and attempted first degree murder convictions, arguing that the circumstantial evidence linking him to the arson was insufficient to exclude every other reasonable theory or hypothesis except that of his guilt of the crimes.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The same standard of review is applicable to convictions based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998). However, if a conviction is based entirely on circumstantial evidence, the facts must be "'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002) (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)). The weight of circumstantial evidence is for the jury to determine. State v. Coury, 697 S.W.2d 373, 377 (Tenn. Crim. App. 1985).

Further, whether all other reasonable theories have been excluded by the evidence is primarily a question of fact for the jury. Pruitt v. State, 460 S.W.2d 385, 391 (Tenn. Crim. App. 1970).

The defendant argues the circumstantial evidence was insufficient to sustain the jury's guilty verdicts because "there were no eyewitnesses to the crime or any type of physical evidence collected at the scene of the fire linking the Appellant." In particular, the defendant points out that the State was unable to establish through DNA analysis the source of the blood found at the scene of the crime. The State responds that the proof at trial was sufficient for a rational jury to conclude beyond a reasonable doubt that it was the defendant who set the fire. We agree with the State.

The proof in this case, viewed in the light most favorable to the State, is sufficient to establish the defendant's identity as the perpetrator and to exclude every other reasonable hypothesis except his guilt of the offenses. The evidence at trial showed that the defendant was angry at Thompson for ending their relationship and jealous at the thought of her with another man. Approximately one week before the fire, the defendant threatened Thompson's children in a conversation with Thompson's next-door neighbor. At roughly the same period of time, on May 25, 2000, the defendant forced Thompson into his car and drove her around against her will, at the same time telling her that he loved her and wanted a chance to start over with her. On the evening before the fire, the defendant telephoned Thompson's house over twenty times and, in one of his conversations with her, threatened to kill her if he discovered that she was with another man. Approximately five minutes after Thompson left the house, someone standing outside the house broke a window in Thompson's bedroom, where her male friend was staying, and a window in a second bedroom, where two of Thompson's three children were sleeping, and threw or poured a gasoline range product inside, setting the house on fire. Broken glass and blood found at the scene suggested that the arsonist cut himself in the process of setting the fire.

The defendant was found shortly after the fire lying on a nearby street with a severely cut arm. A trail of blood led from the pools of blood where the defendant was found back toward the scene of the fire. The defendant told the paramedic who treated him that he had cut his arm on glass and twice answered in the affirmative when asked, first by a police officer and then by the fire investigator, if he had cut himself starting the fire. Finally, a gasoline range product was present on the defendant's clothing. This evidence, taken together, was sufficient to point the finger of guilt unerringly at the defendant as the perpetrator of the crimes. In the face of such overwhelming evidence of his guilt, the State did not need to conclusively establish through DNA testing that the blood found at the scene of the crime matched the defendant. We conclude, therefore, that the evidence was sufficient for the jury to find the defendant guilty of aggravated arson and four counts of attempted first degree murder beyond a reasonable doubt. Further, although not specifically raised by the defendant, we conclude that the evidence was also sufficient to support the defendant's convictions for theft under $500, false imprisonment, and assault.

## II. Motion to Suppress Defendant's Statements

The defendant next contends the trial court erred in denying his motion to suppress his statements to Officer Fugh and Captain Jacks. The defendant moved to suppress his statements pretrial on the basis that neither Officer Fugh nor Captain Jacks provided him with his Miranda warning or obtained his waiver of rights before questioning him about his involvement in the fire. After ascertaining that the defendant had not been arrested or placed in handcuffs, the trial court denied the motion, finding that the defendant was not in custody at the time he was questioned, and thus, Miranda did not apply.

Our supreme court has set forth the standard by which an appellate court is to review a trial court's ruling on a motion to suppress:

> Because issues of whether a defendant was placed into custody, interrogated, or voluntarily gave a confession are primarily issues of fact, we review these factual determinations by the trial court according to the standard set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Questions about witness credibility and "resolution of conflicts in the evidence are matters entrusted to the trial judge," and the "testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress." Our review of a trial court's application of law to the facts, however, is conducted under a *de novo* standard of review.

State v. Walton, 41 S.W.3d 75, 81 (Tenn.) (citations and footnote omitted), cert. denied, 534 U.S. 948, 122 S. Ct. 341, 151 L. Ed. 2d 258 (2001).

On appeal, the defendant asserts that he was in custody when he was questioned because he was a suspect and physically unable to leave the scene. He, therefore, argues that his statements should have been suppressed because he was not in a position, given his physical condition at the time, to knowingly and voluntarily waive his right to remain silent. The State responds by arguing that the trial court correctly found that the defendant was not in custody at the time he gave his statements, and thus, Miranda was not implicated. We agree with the State.

In Miranda v. Arizona, 384 U.S. 436, 471-75, 86 S. Ct. 1602, 1626-28, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that a defendant's statements made during a custodial interrogation are inadmissible at trial unless the State establishes that the defendant was informed of his right to remain silent and his right to counsel and that the defendant knowingly and voluntarily waived those rights. The Court defined a "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom

of action in any significant way." Id., 384 U.S. at 444, 86 S. Ct. at 1612. Our supreme court has set forth a number of factors to consider in determining whether a reasonable person would consider himself in custody, including the following:

> "[T]he time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will."

Walton, 41 S.W.3d at 82-83 (quoting State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996)). Our supreme court has further defined an arrest in Tennessee as involving an "actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer." State v. Crutcher, 989 S.W.2d 301-02 (Tenn. 1999).

We conclude that the evidence in this case does not preponderate against the trial court's finding that the defendant was not arrested or in custody when questioned by Officer Fugh and Captain Jacks and that the requirements of Miranda therefore did not apply. Although the law enforcement officers suspected the defendant of setting the fire, the record establishes that he was not under arrest or in handcuffs at the time he was questioned about his injuries. To be considered in custody for the purposes of triggering the Miranda warning, the defendant must be either under arrest or deprived of his freedom of action in a manner associated with a formal arrest. See Walton, 41 S.W.3d at 82. "This Court has expanded this definition to mean 'under the totality of the circumstances, [whether] a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest.'" Id. (quoting Anderson, 937 S.W.2d at 855). Here, the defendant's encounters with the law enforcement officers were not voluntary, but the officers were not responsible for the defendant's inability to physically avoid the confrontations. What weight, if any, the defendant's statements carried was for the jury to decide, which heard evidence about the defendant's condition at the time he made the statements, as well as the results of his drug and alcohol tests performed upon his admission to the hospital.

### III. Rebuttal Witness Called During State's Case in Chief

The defendant next contends the trial court committed reversible error by allowing the State to call a rebuttal witness during the presentation of its case in chief. On the morning of the second day of trial, the State informed the trial court that, based on the previous day's cross-examination of

Thompson, it wished to present Thompson's supervisor at Heritage Hosiery, Phillip Woodall, to rebut the suggestion that Thompson had failed to immediately report the kidnapping:

> [PROSECUTOR]: Judge, based on some questions that [defense counsel] asked yesterday, I have a witness from -- that was her supervisor at the hosiery mill. You know her questions were, you went back in and sort of implying that she really didn't go back in and tell somebody. It's not a witness that's been listed previously, but it's to rebut what she said. Now, I could hold it for my rebuttal proof, but I think it's proper at this point to go ahead and rebut.

Defense counsel objected that, as a rebuttal witness, Woodall's testimony should properly come after the defendant's case. However, the trial court overruled the objection, ruling that the State would be allowed to present the witness after defense counsel first had a chance to talk with him to eliminate any surprise that could be created by his testimony:

> THE COURT: I don't see it really makes any difference. You know, as long as you have a chance to talk to him and it's not like it's a major -- it's a rebuttal type witness. I don't think it really matters when. I mean, it came as a surprise to her [prosecutor] that it was an issue, I guess. But I'll let you talk to him so it's no surprise.
>
> [DEFENSE COUNSEL]: Thank you.
>
> THE COURT: But just to make it run smooth I'd rather it -- I don't like to have rebuttal stuff unless we have to after your proof, you know, unless we have to.

The admission of rebuttal evidence lies within the sound discretion of the trial court, and this court will not overturn that decision absent a clear showing of an abuse of discretion. State v. Kendricks, 947 S.W.2d 875, 884 (Tenn. Crim. App. 1996); State v. Braden, 867 S.W.2d 750, 760 (Tenn. Crim. App. 1993). "Any competent evidence which explains or directly applies to evidence introduced by the accused is admissible in rebuttal." State v. Yarbro, 618 S.W.2d 521, 525 (Tenn. Crim. App. 1981). The defendant argues on appeal that Woodall was a material, rather than a rebuttal, witness whose testimony should have been excluded based on the State's failure to provide his name prior to trial. However, we find no abuse of discretion by the trial court in allowing his testimony. Defense counsel's questions during cross-examination cast doubt upon Thompson's claim of having immediately reported the kidnapping and implied that she had fabricated the episode. The State then called Woodall to testify that Thompson appeared upset when she arrived late to work, and she immediately informed him of the kidnapping. The trial court allowed defense counsel an opportunity to speak with Woodall before his testimony, thereby eliminating any surprise. Trial counsel was able to bring out on cross-examination that the only source of Woodall's knowledge about the kidnapping was Thompson, and that she did not appear to have any injuries.

The defendant has not shown how he was prejudiced by the order in which the State was allowed to call the witness. We conclude, therefore, that this issue is without merit.

## IV. Sentencing

The defendant next contends the trial court erred in sentencing by misapplying enhancement and mitigating factors. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentences imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

The defendant's aggravated arson and attempted first degree murder convictions are Class A felonies. In imposing a sentence for a Class A felony, the trial court is to start at the midpoint in the range, increase the sentence based on any applicable enhancement factors, and then reduce the sentence as appropriate based on any applicable mitigating factors. Tenn. Code Ann. § 40-35-210(c), (d), (e) (2003). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Id. § 40-35-210, Sentencing Commission Cmts.; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986); see Ashby, 823 S.W.2d at 169.

The defendant argues that the trial court erroneously applied enhancement factor (11), that he had no hesitation about committing a crime when the risk to human life was high, Tenn. Code Ann. § 40-35-114(11) (2003), and enhancement factor (17), that the crime was committed under circumstances under which the potential for bodily injury to a victim was great, id. § 40-35-114(17), to his aggravated arson sentence because the risk to human life and potential for bodily injury to a victim are both inherent in the crime of aggravated arson. The defendant further argues that the trial court erred by failing to apply his abusive childhood as a factor in mitigation. See id. § 40-35-113(13). The State argues that enhancement factors (11) and (17) were appropriate to enhance the defendant's aggravated arson sentence based on evidence of the multiple victims who were present in the home at the time the fire was set, and the trial court properly declined to give the defendant's abusive childhood any weight as a mitigating factor.

At the defendant's November 4, 2002, sentencing hearing, Fire Investigator Randy Jacks testified that there were four individuals, Thompson's male friend and her three children, sleeping in the duplex at the time the fire was set. He said that, based on his experience, all four individuals were at a substantial risk of harm from the fire and that all four, as well as the individual who resided in the adjoining duplex, could possibly have been killed.

Three of the defendant's sisters, Olivia Bradley, Valerie Bradley, and Mary Horner, testified in the defendant's behalf. All three said that they loved their brother and described him as a good person. Olivia Bradley testified that the defendant was hardworking, generous, and friendly and that he loved children. She said she considered him a good brother and had supported him throughout the trial and sentencing hearing. Valerie Bradley also testified that the defendant was hardworking and good with children. She said that she loved him, and her children missed their uncle. Finally, Mary Horner testified that when she and the defendant were children, their father, who claimed that the defendant was not his son, kept the defendant locked in a small pantry for days at a time. Horner said that she and her siblings had to "sneak" the defendant food by throwing "candy and chips and whatever" from the outside through a small, high window into the pantry. Horner testified that their mother was blind, and their father had only one leg and walked with the aid of a stick. She said that their father beat their mother with the stick and also beat the defendant with the same stick. She testified that, in spite of his background, the defendant was the only one of the ten children in the family who attended college. She said the defendant always helped people and characterized him as a good person.

In addition, defense counsel submitted as mitigation evidence a number of certificates the defendant had earned in drug, alcohol, and anger management courses during the course of his incarceration.

The trial court found no enhancement factors applicable to the theft, false imprisonment, and assault convictions and sentenced the defendant to six months for each of those convictions. The trial court applied enhancement factor (10), the defendant possessed or employed a firearm, explosive device or other deadly weapon in the commission of the offense, Tenn. Code Ann. § 40-35-114(10) (2003), to the attempted first degree murder convictions and increased his sentence one year from the presumptive midpoint sentence of twenty years for those convictions. As for the aggravated arson conviction, the trial court applied enhancement factors (4), the offense involved more than one victim, id. § 40-35-114(4), and (7), there was a substantial amount of property damage sustained, id. § 40-35-114(7), but declined to assign either of those factors much weight. The trial court found, however, that the defendant's manner of committing the offense, by throwing Molotov cocktails through the bedroom windows of a house in which people were sleeping, made enhancement factors (11) and (17) applicable to the offense, and that both of these factors were entitled to substantial weight. The trial court therefore increased the defendant's sentence for aggravated arson from the presumptive midpoint of twenty years to twenty-two years.

The defendant challenges the trial court's enhancement of his sentence for aggravated arson, arguing that enhancement factors (11) and (17) should not have been used to increase his sentence

-14-

because both factors are inherent in the offense of aggravated arson. However, in State v. Lewis, 44 S.W.3d 501, 507 (Tenn. 2001), our supreme court held that the high risk to human life enhancement factor may appropriately be applied to a conviction for aggravated arson when there are multiple victims involved. The court reasoned that because it takes only a single individual in a structure to elevate arson to aggravated arson, evidence that multiple victims were placed at risk shows "'a culpability distinct from and appreciably greater than that incident to the offense for which [the defendant] was convicted.'" Id. (quoting State v. Jones, 883 S.W.2d 597, 603 (Tenn. 1994)). Here, there was proof that the duplex fire endangered multiple lives, including not only the four occupants of Thompson's duplex, but also the resident in the adjoining duplex.

This court has previously held that the potential for bodily injury enhancement factor is not appropriate to enhance a sentence for aggravated arson because a potential for bodily injury is inherent in the offense. See State v. Kerwin L. Walton, No.02C01-9512-CR-00372, 1997 WL 576447, at *3 (Tenn. Crim. App. Sept. 17, 1997); State v. Robert Gene Malone, No. 03-C-01-9110-CR-00307, 1992 WL 62014, at *5 (Tenn. Crim. App. Mar. 31, 1992). Therefore, the trial court erred in applying enhancement factor (17) to the defendant's sentence. However, although not considered by the trial court, there was ample evidence to support the application of enhancement factor (5), a victim was particularly vulnerable because of age or physical or mental disability, for both the aggravated arson and attempted first degree murder convictions, due to the victims having been asleep at the time the fire was set. See Lewis, 44 S.W.3d at 506 (finding particularly vulnerable enhancement factor applicable when arson was committed at 3:00 a.m., a time when residents of apartment building were sleeping).

The trial court considered the evidence of the defendant's abusive childhood, his completion of anger management and drug and alcohol classes, and his family's support as a "catchall" factor in mitigation, but determined that it was entitled to little, if any, weight. With respect to the mitigation evidence, the trial court stated:

> Upon the testimony before me, under the mitigating factor No. 13, the catchall, that he has received certificates for anger management, discipleship classes, drug rehab type classes, I find that he apparently suffered some very sad child abuse in this young age, that he currently has support from his sisters who obviously love him and that he has a limited, a minor misdemeanor criminal history in this case. However, totally, giving weight to all of those things, I don't find that they outweigh or mitigate or back the sentence down or should affect the prior sentence. They are not significant enough, don't hold enough weight to change the sentence down from the sentences given.

We find no error in the trial court's refusal to give any weight in mitigation to the defendant's history of having suffered an abusive childhood or, in light of the applicable enhancement factors, the trial court's enhancement of the defendant's sentences for aggravated arson and attempted first

degree murder beyond the presumptive midpoint in the range. Accordingly, we affirm the sentences imposed by the trial court.

## IV. Cumulative Errors

Finally, we find no merit to the defendant's claim that cumulative errors deprived him of a fair trial.

## <u>CONCLUSION</u>

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court. However, because the defendant's judgment form for assault in Count 2 of Case No. 234375 erroneously lists his sentence as six years rather than six months, we remand for entry of a corrected judgment for that offense.

_____
ALAN E. GLENN, JUDGE